**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

JOHN EDWARD HOAG,

           Plaintiff,

   v.                                Civil No. 09-0969 (RMB)

MICHAEL J. ASTRUE, COMMISSIONER     **OPINION**
OF SOCIAL SECURITY,

           Defendant.


Appearances:

David Jay Lyons, Esq.
The Lyons Law Firm
1526 Gilpin Avenue, P.O. Box 579
Wilmington, Delaware 19899
Attorney for Plaintiff

Eric P. Kressman
   Regional Chief Counsel
Nicole Schmid
   Assistant Regional Counsel
David C. Weiss
   United States Attorney
Patricia Stewart
   Special Assistant United States Attorney
District of Delaware
Office of General Counsel
Social Security Administration, P.O. Box 41777
Philadelphia, Pennsylvania 19101
        Attorneys for Defendant

**BUMB,** UNITED STATES DISTRICT JUDGE:

Plaintiff John E. Hoag seeks review pursuant to 42 U.S.C. § 405(g) of the Commissioner of Social Security's (the "Commissioner's") final decision denying his claim for disability insurance benefits ("DIB") under the Social Security Act. Plaintiff filed a motion for summary judgment, and the Commissioner opposed that motion and filed a cross-motion for summary judgment. For the foregoing reasons, the Court affirms the Administrative Law Judge's ruling that Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Accordingly, the Court denies Plaintiff's motion and grants the Commissioner's cross-motion.

## I. BACKGROUND

### A. Procedural History

It appears that Plaintiff Hoag applied for DIB on May 31, 2005, alleging disability beginning May 3, 1999.[1] The claim was

---

[1] The Court notes a discrepancy in the record. The Administrative Law Judge's opinion (R. 14), the Physical Residual Functional Capacity Assessment (Tr. 237), and Hoag's summary judgment papers (Pl.'s Br. 6) state that Plaintiff applied for DIB on May 31, 2005, alleging disability beginning May 3, 1999. However, the Commissioner's summary judgment papers (Def.'s Br. 1) and Hoag's unsigned application for disability insurance benefits (Tr. 42) state that he applied for disability in early June 2005 and that the disability started on January 1, 2003. In an abundance of caution, the Court considers the broader time period, from May 3, 1999 through the date last insured on December 31, 2004. In any case, this discrepancy is immaterial, since the Court affirms the ALJ's decision that Plaintiff did not have a disability within the meaning

denied on October 26, 2005. (R. 14.) Plaintiff requested a hearing, which was held on June 26, 2007, before Administrative Law Judge Linda M. Bernstein (the "ALJ"). (R. 368.) Plaintiff, who was represented by counsel, appeared and testified at the hearing, as well as his wife, and a vocational expert. (R. 369.)

On October 4, 2007, the ALJ issued a decision finding that Plaintiff had the following severe impairments: lung cancer in remission, peripheral neuropathy, status post myocardial infarction, status post cerebrovascular accident, and a seizure disorder. (R. 16.) The ALJ found that despite these impairments, Plaintiff had the residual functional capacity to perform the full range of sedentary work through the date last insured, December 31, 2004. (R. 17.) Citing the vocational expert's testimony, the ALJ found that Plaintiff's residual functional capacity would not prevent him from performing his past sedentary work as a meter reader chief. (R. 20.) Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act, at any time from May 3, 1999, the alleged onset date, through December 31, 2004, the date last insured. (R. 20.)

_____

of the Social Security Act during that time. The parties have not disputed the date last insured, on December 31, 2004. (R. 16; Pl.'s Br. 6.)

Plaintiff sought review of the ALJ's decision (R. 9-10), and on October 30, 2009, the Appeals Council denied Plaintiff's request (R. 5-8). Accordingly, the ALJ's decision became the final decision of the Commissioner for purposes of judicial review. See 20 C.F.R. § 404.981. On December 18, 2009, Plaintiff filed the above-captioned action in this Court. (See Dkt. Ent. 1.) Plaintiff filed a motion for summary judgment on August 31, 2010. The Commissioner filed an opposition and cross-motion for summary judgment, and Plaintiff never filed a reply brief.

**B.    Evidence in the Record**

### *1. The Hearing*

At the time of the ALJ hearing on June 26, 2007, Plaintiff was sixty-three years old, living with his wife, Marjorie Hoag, and receiving Social Security retirement insurance benefits. (R. 373, 381.) He testified that he worked as a meter reader supervisor until he developed lung cancer in May 1999. (R. 376.)

Plaintiff testified that after undergoing chemotherapy for lung cancer, he developed peripheral neuropathy ("PN"), a severe painful burning in his feet. (R. 380.) Although Plaintiff could not recall the date that the PN started, he testified that it began as a "minor discomfort" and eventually "progressed into

4

constant burning" by the end of 2004. (R. 386-87.) He testified that sometimes the pain "doesn't bother [him] at all," and sometimes it is so painful that he is forced to take his shoes off and put his feet in a bucket of water. (R. 381.) However, Plaintiff later testified that in 2003, he experienced a burning sensation in his feet "pretty much every day." (R. 396.)

The ALJ questioned him about an office visit with Dr. Gorino on October 11, 2006, in which Dr. Gorino reported that Plaintiff "is exercising regularly, five days a week on a treadmill, and doing weights as part of a cardiovascular program." (R. 396.) Plaintiff conceded that he does use a treadmill and can walk half a mile (R. 396), although he later stated that he could only walk a block (R. 410).

Plaintiff also testified that he attends a special gym for people with health problems, approximately three to four times a week, (R. 381-82), and plays golf, usually riding a golf cart instead of walking, once or twice a week (R. 383).

He contended that prior to 2004, he had good days, when he could perform minor household chores, and bad days, when he could not. (R. 409.)

Although Plaintiff initially testified that he was prescribed Neurontin in 2003 only for his PN and not for seizures

(R. 390-91), he later testified that it was prescribed to treat both his feet and his seizure disorder.  (R. 395.)

He also testified that due to a stroke, he has difficulty walking up stairs.  (R. 381.)

According to Plaintiff's wife's testimony, Plaintiff's PN started in 2000 and became progressively worse.  (R. 412-13.) She stated that there were days in 2004 when he could not wear shoes and that he could only do light work around the house, but no yard work.  (R. 413-14.)  She reported that Plaintiff still had shortness of breath and, due to the effects of the stroke, his left leg was weak, and he had trouble getting up and down. (R. 415-16.)

Beth Kelly, the vocational expert, testified that Plaintiff's past work as a meter reader chief was skilled sedentary work as it generally exists, and light as performed by Plaintiff.  (R. 419.)

### 2. Medical Reports

#### a. Michael J. Guarino, M.D.

Plaintiff underwent surgery to remove a malignant tumor from his right lung on May 3, 1999.  (R. 85.)  Dr. Michael J. Guarino, an oncologist, subsequently evaluated him on June 2, 1999.  (R. 85-87.)  Dr. Guarino again evaluated Plaintiff on April 21, 2004.

He noted that there was no clinical evidence of tumor relapse since Plaintiff's completion of his cancer treatment four and a half years prior. (R. 84.) Six months later, Dr. Guarino reported that Plaintiff continued to display no clinical evidence of tumor activity. (R. 83.)

On October 12, 2005, Plaintiff reported that he was exercising three times per week and had some mild shortness of breath with exertion. (R. 250.) Following examination, Dr. Guarino reported that Plaintiff "continues to do well by his functional status" and should return for a follow-up examination in one year. (R. 250.)

On October 11, 2006, Plaintiff stated that as part of a cardiovascular program he was exercising five days per week on a treadmill and also lifting weights. (R. 249.) Dr. Guarino concluded that it had been seven years since Plaintiff's completion of his cancer treatment therapy and that he had no evidence of recurrent tumor activity. (R. 249.)

### b. Nicholas Biasotto, D.O.

Dr. Biasotto, a family practice doctor, treated Plaintiff from December 1999 through Plaintiff's date last insured. (R. 336-348.) Importantly, on July 5, 2003, Plaintiff complained of burning and numbness in his feet, and Dr. Biasotto prescribed

Neurontin.  (R. 338.)  The subsequent treatment notes reflect
that Dr. Biasotto continued to prescribe Neurontin.  (R. 336-38.)
These notes also reflect that although Plaintiff subsequently
complained of other problems through the date last insured,
including arm and lower back pain, he did not complain of
burning, numbness, or pain in his feet again.  (R. 336-38.)

On January 11, 2006, over one year after Plaintiff's date
last insured, Dr. Biasotto completed a medical impairment
evaluation form for Plaintiff's social security application,
which stated that Plaintiff's medical impairments were expected
to result in death.  (R. 229.)  He also noted that Plaintiff's
lung cancer, neuropathy, cerebral vascular accident (stroke),
seizure disorder, and coronary artery disease had been
"disabling" since 1999.  (R. 229.)  Dr. Biasotto noted that
Plaintiff's impairments would prevent him from performing his
past work as a meter reader chief and that his performance of
this job could cause his death.  (R. 230.)

He noted that walking, climbing, and usage of Plaintiff's
lower extremities would aggravate Plaintiff's conditions (R.
230), but that Plaintiff's coronary artery disease and past lung
cancer were under control (R. 231).  Dr. Biasotto noted that
Plaintiff's symptoms were an inability to walk due to neuropathy

and shortness of breath due to his lung restrictions.  (R. 232.)
When asked to describe the signs, defined as "anatomical,
physiological, or psychological abnormalities which are
demonstrable, apart from [Plaintiff's] symptoms, by medically
acceptable clinical diagnostic techniques," Dr. Biasotto
responded with a "?" symbol.  (R. 232.)

The attached "Physical Capacities Evaluation" indicates that
in an eight-hour workday, Plaintiff can only sit for two hours
and cannot stand or walk for any amount of time at all.  It
states that he can never lift or carry any weight, even under 10
pounds.  (R. 234-35.)

### c.  Christiana Hospital

Plaintiff had a seizure on July 28, 2002, and sought
emergency treatment at Christiana Hospital.  (R. 100.)  Upon
admission, testing revealed that Plaintiff was having a heart
attack.  (R. 100.)  He underwent an emergency triple coronary
artery bypass graft and tolerated the procedure well.  (R. 100.)
Jorge Serra, M.D., discharged Plaintiff on August 1, 2002, in
stable condition.  (R. 101.)

Plaintiff returned to Christiana Hospital just two days
later on August 3, 2002, complaining of left underarm pain and
back pain.  (R. 136.)  George Slupko, M.D., diagnosed upper arm

and shoulder strain and discharged Plaintiff the following day. (R. 138.)

On December 19, 2002, Plaintiff returned to Christiana Hospital emergency department after becoming unable to use his left leg to stand or walk. (R. 151.) A magnetic resonance imaging (MRI) scan and a magnetic resonance angiogram (MRA) scan of Plaintiff's brain showed a hemorrhagic small stroke. (R. 151.) Plaintiff underwent physical therapy, and Dr. Biasotto discharged him on December 24, 2002, in stable condition with instructions to continue physical therapy. (R. 152.)

On October 25, 2003, Plaintiff returned to Christiana Hospital after having a seizure. (R. 200.) Dr. Kevin M. Boyle discharged Plaintiff on October 29, 2003, with instructions to seek follow-up treatment with various physicians. (R. 201-02.)

d. <u>Kevin Boyle, M.D.</u>

Dr. Boyle, a cardiologist, began treating Plaintiff following his heart attack in July 2002. On September 27, 2004, Plaintiff complained of feeling "wobbly" upon standing. (R. 122.) Dr. Boyle attributed this complaint to a change in Plaintiff's high blood pressure medication. (R. 122.) Upon examination, Plaintiff had no abnormalities in his extremities and voiced no other complaints. (R. 122.)

Four months after his date last insured, on April 7, 2005, Plaintiff reported feeling well and denied experiencing any chest pain or shortness of breath.  (R. 119.)  Once again, Plaintiff had no abnormalities in his extremities.  (R. 119.)

### e.   Lanny Edelsohn, M.D.

Dr. Edelsohn, a neurologist, first treated Plaintiff in December 2002, after he had suffered a stroke.  She examined Plaintiff again in July 2003.  (R. 185-88.)  Plaintiff denied having any focal neurological problems and reported taking Neurontin.  (R. 186.)  On examination, Plaintiff had normal muscle strength, intact sensory perception, and a normal ability to walk.  (R. 187.)  Plaintiff returned to see Dr. Edelsohn the following month and reported doing well.  (R. 182.)  He continued to have normal muscle strength and a normal ability to walk.  (R. 183.)

On November 14, 2003, Plaintiff returned to see Dr. Edelsohn, after having suffered a generalized seizure during sleep the previous month.  Dr. Edelsohn noted that because of his wife's good description of the seizure, Plaintiff had been started on Dilantin.  (R. 180.)  On examination, Plaintiff continued to have normal muscle strength, intact sensory perception, and a normal ability to walk.  (R. 180.)

Plaintiff returned to Dr. Edelsohn on February 27, 2004, and reported that he was doing well. (R. 177.) Again, Dr. Edelsohn reported a normal ability to walk and normal muscle strength. (R. 178.) Dr. Edelsohn noted that Plaintiff "may return to driving for necessities only." (Id.)

On August 19, 2004, Plaintiff reported to Dr. Edelsohn that he continued to do well and that he had taken up golf and was getting exercise as a result of this activity. (R. 175.) Plaintiff continued to take Neurontin and on examination had good muscle strength, intact sensory perception, and a normal ability to walk. (R. 176.)

On March 8, 2005, just two months after the date last insured, Plaintiff reported doing "extremely well" and that he continued to use Neurontin. (R. 173.) Dr. Edelsohn noted that his "only complaint" was "a feeling of unsteadiness when he first stands." (R. 173.) Again, he retained normal muscle strength and also had a normal ability to walk. (Id.)

       f. State Agency Physical Residual Functional Capacity Assessment

Robert Palandjian, D.O., a state agency physician, reviewed the evidence of record and completed a physical residual functional capacity assessment form on August 27, 2005. (R. 237-

44.)  Dr. Palandjian found that Plaintiff could lift ten pounds

occasionally, less than ten pounds frequently, could stand and/or

walk at least two hours during an eight-hour workday, and sit

about six hours during an eight-hour workday.  (R. 238.)  He also

found that Plaintiff could never climb ladders, rope, or

scaffolds, could occasionally climb ramps and stairs, could

occasionally kneel, crouch, and crawl, could frequently stoop,

needed to avoid concentrated exposure to humidity, and needed to

avoid even moderate exposure to temperature extremes,

environmental pollutants, and hazards.  (R. 241.)

## II.  DISCUSSION

### A. Standard of Review

When reviewing a final decision of the Social Security

Commissioner, the Court must uphold the Commissioner's factual

decisions if they are supported by "substantial evidence."  42

U.S.C.§§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d

Cir. 2000).  "Substantial evidence" means "'more than a mere

scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  Richardson

v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co.

v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d

422, 427 (3d Cir. 1999).  Where the ALJ's findings of fact are

supported by such evidence, the Court is bound by the
Commissioner's findings, "even if [it] would have decided the
factual inquiry differently." Fargnoli v. Massanari, 247 F.3d
34, 38 (3d Cir. 2001) (citing Hartranft v. Apfel, 181 F.3d 358,
360 (3d Cir. 1999)).  Thus, this Court must "review the evidence
in its totality, but where it is susceptible of more than one
rational interpretation, the Commissioner's conclusion must be
upheld." Ahearn v. Comm'r of Soc. Sec., 165 Fed. Appx. 212, 215
(3d Cir. 2006)(citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir.
1984); Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d
Cir. 1986)).

Where the Commissioner is faced with conflicting evidence,
however, "he must adequately explain in the record his reason for
rejecting or discrediting competent evidence." Ogden v. Bowen,
677 F.Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler,
786 F.2d 581 (3d Cir. 1986)).  Stated differently,

> "[U]nless the [Commissioner] has analyzed all evidence and
> has sufficiently explained the weight he has given to
> obviously probative exhibits, to say that his decision is
> supported by substantial evidence approaches an abdication
> of the court's 'duty to scrutinize the record as a whole to
> determine whether the conclusions reached are rational.'"

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)(quoting
Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th

Cir. 1977)); see also Guerrero v. Comm'r of Soc. Sec., Civ. No. 05-1709, 2006 WL 1722356, *3 (D.N.J. June 19, 2006) (stating that it is the ALJ's responsibility "to analyze all the evidence and to provide adequate explanations when disregarding portions of it"), aff'd, 249 Fed. Appx. 289 (3d Cir. 2007).

While the ALJ must review and consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections," Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000), "[t]here is no requirement that the ALJ discuss in [her] opinion every tidbit of evidence included in the record." Hur v. Barnhart, 94 Fed. Appx. 130, 133 (3d Cir. 2004); see also Fargnoli, 247 F.3d at 42 ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.").

In addition to the substantial evidence inquiry, this Court must also review whether the administrative determination was made upon application of the correct legal standards. See Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Friedberg v.

_Schweiker_, 721 F.2d 445, 447 (3d Cir. 1983).  The Court's review

of legal issues is plenary.  _Sykes_, 228 F.3d at 262 (citing

_Schaudeck v. Comm'r of Soc. Sec._, 181 F.3d 429, 431 (3d Cir.

1999)).

### B. "Disability" Defined

The Social Security Act defines "disability" as the

inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not

less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The Act

further states,

> [A]n individual shall be determined to be under a disability
> only if his physical or mental impairment or impairments are
> of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he applied for
> work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential

analysis for evaluating a claimant's disability, as outlined in

20 C.F.R. § 404.1520(a)(4)(i)-(v).  In _Plummer_, 186 F.3d at 428,

the Third Circuit set out the Commissioner's inquiry at each step

of this analysis:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 1520(a).  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(d).  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(d).  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step.  At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f).  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  See 20 C.F.R. § 404.1523.  The ALJ will often seek the assistance of a vocational expert at this fifth step.  See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

C. **Analysis**

Plaintiff Hoag argues that the ALJ erred in concluding that
he is not disabled within the meaning of the Social Security
Regulations.  (Pl.'s Br. 4.)  He now seeks an award of attorney's
fees[2] and a remand to the ALJ to reconsider all evidence in the
case.  His primary contention is that the ALJ failed to afford
appropriate deference to the medical source statement completed
by his treating physician, Dr. Biasotto.  (R. 229-232.)

"A cardinal principle guiding disability eligibility
determinations is that the ALJ accord treating physicians'
reports great weight, especially 'when their opinions reflect
expert judgment based on a continuing observation of the
patient's condition over a prolonged period of time.'"  Morales
v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer, 186
F.3d at 429).  "However, 'where . . . the opinion of a treating
physician conflicts with that of a non-treating, non-examining
physician, the ALJ may choose whom to credit' and may reject the
treating physician's assessment if such rejection is based on
contradictory medical evidence."  Becker v. Comm'r of Soc. Sec.,

---

[2] Since the Court affirms the ALJ's denial of disability benefits, Plaintiff
is therefore not a prevailing party and not entitled to attorney's fees.  See
5 U.S.C. § 504(a)(1); Brown v. Sec'y of Health & Human Serv., 747 F.2d 878,
880-81 (3d Cir. 1984).  Accordingly, the Court denies this motion.

Civ. No. 10-2517, 2010 WL 5078238, *5 (3d Cir. Dec. 14, 2010)

(citing Morales, 225 F.3d at 317).  The regulations instruct:

> Generally, we give more weight to opinions from your
> treating sources, since these sources are likely to be the
> medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may
> bring a unique perspective to the medical evidence that
> cannot be obtained from the objective medical findings alone
> or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations. If we
> find that a treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is well-supported
> by medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other
> substantial evidence in your case record, we will give it
> controlling weight.

20 C.F.R. § 404.1527(d)(2)(emphasis added).  The regulations also

provide that when the ALJ does not give the treating source's

opinion controlling weight, it will determine the weight to give

the medical opinion based on several factors, including (1) the

length of the treatment relationship and frequency of

examination; (2) the nature and extent of the treatment

relationship; (3) the degree to which the medical opinion is

supported with relevant evidence, including medical signs and

laboratory findings; (4) the degree to which the opinion is

consistent with the record as a whole; (5) the doctor's

specialization and whether his opinion relates to his area of

specialty; and (6) other factors, which the claimant or others

19

brings to the Commissioner's attention.  20 C.F.R. §§
404.1527(d)(2)(i-ii) & (d)(3-6).

Thus, "the opinion of a treating physician is to be given
controlling weight <u>only</u> when it is well-supported by medical
evidence and is consistent with other evidence in the record."
<u>Becker</u>, 2010 WL 5078238, *5 (emphasis added).  Where the treating
physician's opinion is "conclusory or unsupported by the medical
evidence in the record," the ALJ is not required to accept it.
<u>Rohrbaugh v. Astrue</u>, 588 F. Supp. 2d 583, 592 (D. Del. 2008).
The ALJ "may afford a treating physician's opinion more or less
weight depending upon the extent to which supporting explanations
are provided."  <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir.
1999) (citing <u>Newhouse v. Heckler</u>, 753 F.2d 283, 286 (3d Cir.
1985)).  Nevertheless, to ensure meaningful review, the ALJ must
adequately explain her decision to accord limited weight to a
treating physician's opinion.  <u>See</u> <u>Wright v. Comm'r of Soc. Sec.</u>,
386 Fed. Appx. 105, 109 (3d Cir. 2010); <u>Becker</u>, 2010 WL 5078238
at *5 ("To ensure meaningful review, the ALJ must discuss the
evidence he considered which supports the result and the evidence
which was rejected, and should give his reasons for accepting
only some evidence while rejecting other evidence[.]") (internal

citations and quotations omitted); Cotter v. Harris, 642 F.2d
700, 705 (3d Cir. 1981), reh'g denied, 650 F.2d 481 (3d Cir.
1981) (noting that the ALJ should "sufficiently explain[] the
weight he has given to obviously probative exhibits").  If the
ALJ's decision is supported by substantial evidence in the
record, this Court must affirm it.  See, e.g., Wright, 386 Fed.
Appx. at 109.

In Becker, the Third Circuit held that the ALJ had properly
rejected portions of two treating physicians' opinions, because
they contradicted the physicians' own treating records.  2010 WL
5078238 at *5.  The first doctor had opined that the plaintiff
had "marked limitation," but his own treatment records indicated
that the Plaintiff's mental limitations were "only moderate."
Id.  The second doctor opined that the plaintiff had chronic
pain, could only sit or stand for certain short periods, and that
her prognosis for improvement was poor, but his treatment records
indicated that the plaintiff "had responded positively to
medication and treatment and could sit, stand, walk, and lift to
some degree."  Id.  The Third Circuit affirmed the ALJ's
rejection of these unsupported opinions, also noting that other
evidence in the record contradicted the second doctor's opinion.

Id.

Similarly, here, the ALJ did not disregard Dr. Biasotto's medical source statement, as Plaintiff contends (Pl.'s Br. 9), but merely determined that it should not carry <u>controlling</u> weight, given its lack of support in the record. (R. 19.) Dr. Biasotto's evaluation, dated over a year after the date last insured, consists of a five-page form, labeled "Medical Impairment Evaluation," with a two-page attachment labeled, "Physical Capacities Evaluation" and a one-page list of medications. (R. 229-36.) As discussed above, <u>see</u>, <u>supra</u>, Part I.B.2.b, this form states in relevant part that Plaintiff's PN is "disabling," that "walking/climbing anything" might aggravate his condition, and that he "can't walk" due to his PN. (R. 230, 232.)

The ALJ determined that this medical source statement was not supported by Dr. Biasotto's treatment records, because after "scouring" them, she found only one mention of PN. (R. 19.) This occurred on July 5, 2003, when Plaintiff complained of bilateral foot burning and numbness, and Dr. Biasotto diagnosed the condition as PN and prescribed Neurontin. (<u>Id.</u> (citing Ex. 26F, p.11).) The ALJ noted that on the next visit, "[t]here was

no mention of PN or anything relative to his feet." (Id.) In fact, the Court notes that the record does not reflect any other complaints regarding PN in any of the 20 subsequent visits between July 2003 and the last visit in the record on June 19, 2007, well after the date last insured. (R. 329-338.) Thus, the ALJ reasoned, "[t]he PN must have resolved, or the Neurontin controlled it adequately." (R. 19.) The ALJ further noted that PN was never mentioned in the oncology or neurology records or in any of the physical examinations during the time of Plaintiff's heart attack or stroke. (Id.) The ALJ cites as examples two treatment notes from Dr. Edelsohn and Dr. Boyle. (Id.) Accordingly, the ALJ concluded that the medical records do not support Dr. Biasotto's assessment, and his opinion should therefore not carry controlling weight. (Id.)

The Court notes that "[t]he ALJ is not required to use particular language or adhere to a particular format in conducting h[er] analysis. Rather, there must be sufficient development of the record and explanation of findings to permit meaningful review." Kenney v. Comm'r of Soc. Sec., 232 Fed. Appx. 183, 185 (3d Cir. 2007) (citing Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). Here, the ALJ has sufficiently

developed the record and explained her findings.  Her opinion
indicates that she diligently reviewed and analyzed the record.
Like the ALJ in Becker, she ultimately assigned limited weight to
Dr. Biasotto's medical source statement, since it did not
accurately reflect conclusions that might logically be drawn from
his treatment notes.  (R. 328-348.)  Indeed, the Court finds
reasonable the ALJ's inference; the fact that Dr. Biasotto's
treatment notes do not reflect any subsequent complaints
regarding Plaintiff's PN suggests that once Plaintiff began
taking Neurontin, his symptoms either lessened to the extent that
he did not feel the need to mention them or Dr. Biasotto did not
feel the need to document them in his treatment notes.
Certainly, if the Neurontin did not mitigate Plaintiff's symptoms
and Plaintiff could not walk, as the medical source statement
contends, it is reasonable to conclude that Plaintiff would have
mentioned such an extreme, debilitating condition in subsequent
visits to Dr. Biasotto, who surely would have made a note of
this.  In fact, Dr. Biasotto did record subsequent complaints of
lower back and arm pain.  (R. 337-38.)

     The Court further notes that like the Becker case, the other
medical records available also do not support Dr. Biasotto's

assessment.  As discussed above, Dr. Edelsohn's treatment notes from 2003 through 2005 consistently report that Plaintiff had normal muscle strength, intact sensory perception, and a normal ability to walk.  See, supra, Part I.B.2.e.  Plaintiff reported that he was doing well, and even playing golf.[3]  See id.  Two months after the date last insured, Plaintiff reported doing "extremely well" and that his "only complaint" was "a feeling of unsteadiness when he first stands," which was due to his stroke.  (R. 173.)  Similarly, Plaintiff's physical therapist reported on January 9, 2007, that Plaintiff stated he felt "basically back to normal," went "golfing and felt fine," and that she believed he had "no limitations in his functional activ[ity] and ha[d] returned to his previous gym workout."  (R. 282.)  After poring through Plaintiff's extensive medical records, the Court has found no other complaints of PN before the date last insured, except his one complaint to Dr. Biasotto in July 2003.  (R. 338.)

The Court also notes that Dr. Biasotto's opinion was not supported by any medically acceptable clinical and laboratory diagnostic techniques, which is necessary to warrant "controlling" weight.  See, supra, at 19.  When asked to describe

---

[3] Plaintiff later attempted to explain this at the ALJ hearing by stating that he had to use a golf cart and could only complete nine holes (R. 382-83), but the ALJ found his testimony "not entirely credible."  (R. 19.)

the "signs," defined as "anatomical, physiological, or psychological abnormalities which are demonstrable, apart from [Plaintiff's] symptoms, by medically acceptable clinical diagnostic techniques," Dr. Biasotto responded merely with a "?" symbol. (R. 232.) Indeed, it appears Dr. Biasotto's medical source statement is not supported with relevant evidence, medical signs or laboratory findings.

Thus, the ALJ's well-reasoned, well-supported opinion provides an adequate explanation for her decision to give limited weight to Dr. Biasotto's opinion. After reviewing the record evidence, the Court is also satisfied that the ALJ's decision is supported by substantial evidence.

Plaintiff also argues, in passing, that the ALJ "failed to properly analyze and apply . . . Dr. Edelsohn's opinions[.]" (Pl.'s Br. 12-13.) The Court notes that Dr. Edelsohn's "opinions" consist of a two-sentence letter, merely stating that Plaintiff "was prescribed Neurontin to control symptoms related to a neuropathy." (Ex. 25F, R. 327.) Again, it appears that the ALJ diligently reviewed and analyzed the record. She notes that although Dr. Edelsohn claims that Plaintiff was prescribed Neurontin for neuropathy, "there were no complaints of neuropathy

in the 25 pages of Dr. Edelsohn's records." (R. 19.) This
Court's review of the record supports the ALJ's determination
that Dr. Edelsohn never mentioned Plaintiff's PN in his treating
notes. (R. 173-87.) As discussed above, Dr. Edelsohn's
treatment notes reflect that Plaintiff had normal muscle
strength, intact sensory perception, and a normal ability to
walk, and that he reported doing well and playing golf. See,
supra, Part I.B.2.e. To the extent that Dr. Edelsohn's opinion
states that Plaintiff was prescribed Neurontin for PN by another
physician, this fact merely supports the inference made by the
ALJ earlier that the Neurontin mitigated Plaintiff's condition to
the extent that he did not feel the need to mention it to his
treating physicians or they did not feel the need to record it.
Accordingly, the Court finds the ALJ's assessment of Dr.
Edelsohn's opinion proper and supported by substantial evidence.

Finally, Plaintiff cursorily asserts that the ALJ did not
adequately consider his testimony or the pharmaceutical records,
which substantiate his treatment of PN and Dr. Biasotto's
assessment. (Pl.'s Br. 4, 12-13.) Again, the Court disagrees.

An ALJ "must give weight to a claimant's testimony 'when
this testimony is supported by competent evidence.'" Wright v.

Comm'r of Soc. Sec., 386 Fed. Appx. 105, 109 (3d Cir. 2010);
Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999)
("Allegations of pain and other subjective symptoms must be
supported by objective medical evidence." (citing 20 C.F.R. §
404.1529)); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433
(3d Cir. 1999). Where the ALJ does not find the claimant's
testimony credible or supported by objective medical evidence in
the record, she need not credit such testimony, so long as her
finding is grounded in the evidence and articulated in her
decision. See, e.g., Wright, 386 Fed. Appx. at 109 (affirming
ALJ's assessment that claimant's statements concerning his
symptoms were "not entirely credible" where record evidence did
not support his testimony); Hartranft, 181 F.3d at 362 (same);
Schaudeck, 181 F.3d at 433. Further, Courts "ordinarily defer to
an ALJ's credibility determination because he or she has the
opportunity at a hearing to assess a witness's demeanor." Reefer
v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Here, the ALJ found that while Plaintiff's "medically
determinable impairments could have been reasonably expected to
produce some of the alleged symptoms," the couple's testimony
regarding the "intensity, persistence and limiting effects" of

these symptoms was "not entirely credible." (R. 19.) After assessing the record, she concluded that Plaintiff and his wife "either exaggerated the effects of PN or are misremembering when the severity developed which they are claiming went back as far as his date last insured." (R. 19.) The ALJ reasoned that since Plaintiff "must show a residual functional capacity below the sedentary exertional level in order to prevail, he is now alleging severe, intractable, PN of the feet, so severe he could not even do the limited walking required by sedentary work." (Id.) However, the ALJ noted, "[t]he record does not support this contention." (Id.) She cites to the single mention of PN in the records before the date last insured (to Dr. Biasotto in July 2003) and notes that although Plaintiff "testified that he consistently told all his doctors about severe foot pain," PN is "never mentioned" in the oncology or neurology records. (Id.) Indeed, although Plaintiff was given complete physical exams during the time of his stroke and heart attack, the ALJ stresses that the records indicate normal sensation and that "complaints about foot pain were never voiced to any doctor." (Id.) She also notes that the record reflects that "[d]espite alleging a debilitated lifestyle . . . claimant took up golf and went to the

gym three times a week."  (Id.)

The Court finds that the ALJ adequately articulated her reasons for finding Plaintiff's and his wife's testimony not entirely credible.  The Court also finds this assessment supported by substantial evidence in the record.  The ALJ appears to have thoroughly and thoughtfully considered the record, vigorously questioned Plaintiff at the hearing, and highlighted relevant parts of the record in her opinion.  As discussed above, the record reflects that Plaintiff only complained of his PN once before the date last insured and that he did not have the type of severe pain he now claims he suffered at the time.

Finally, Plaintiff argues that the ALJ erred by reaching her conclusions "without citation to or discussion of the pharmaceutical records supplied to substantiate Hoag's treatment of PN."  (Pl.'s Br. 13.)  However, "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  Hur v. Barnhart, 94 Fed. Appx. 130, 133 (3d Cir. 2004).  If the ALJ's findings are supported by substantial evidence, the Court is bound by them.  See Fargnoli v. Massanari, 247 F.3d at 38.

In any case, the Court disagrees with Plaintiff's

characterization of the ALJ's opinion.  Although the ALJ does not cite the actual exhibit listing Plaintiff's pharmaceutical records, it is quite clear that she did consider Plaintiff's treatment with Neurontin.  (<u>See</u> R. 19.)  The ALJ highlighted this fact in concluding that Dr. Biasotto's opinion should be given limited weight.  She noted that his treatment records indicated that once Plaintiff began treating with Neurontin, he did not again complain about PN.  Thus, she reasonably deduced, "[t]he PN must have resolved, or the Neurontin controlled it adequately." (R. 19.)  The Court therefore rejects Plaintiff's claim that the ALJ erred by failing to "cite or discuss" Plaintiff's pharmaceutical records.

## III. Conclusion

Accordingly, for the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence and is affirmed.  An accompanying Order will issue this date.


Dated: <u>March 7, 2011</u>                    <u>s/Renée Marie Bumb</u>
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE